IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs August 2, 2016

**EDDIE MEDLOCK v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. P-27449    Glenn Ivy Wright, Judge**

_____

**No. W2015-02130-CCA-R3-PC  -  Filed October 21, 2016**

_____

A jury convicted the Petitioner, Eddie Medlock, of two counts of aggravated rape and two counts of especially aggravated kidnapping perpetrated during the brutal assault of his ex-girlfriend.  On direct appeal, this court vacated one count of especially aggravated kidnapping but affirmed the other convictions and the Petitioner's sentence of one hundred and twenty years.  The Petitioner filed a timely petition for post-conviction relief on June 27, 2003, but the post-conviction court did not enter a final disposition until October 1, 2015, when it denied the petition.  On appeal, the Petitioner alleges that the post-conviction court erred in denying him funding for expert analysis during the post-conviction proceeding and that he received the ineffective assistance of counsel at trial and on appeal. After a thorough review of the record, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT L. HOLLOWAY, JR., JJ., joined.

James E. Thomas, Memphis, Tennessee, for the appellant, Eddie Medlock.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Ann Schiller, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

## Trial Proceedings

The proof at the Petitioner's trial showed that the Petitioner assaulted his ex-girlfriend (the victim), and then raped her with a heated coat hanger. The Petitioner raped the victim a second time and then left her tied up and locked inside a residence they had recently shared. This court summarized the evidence in the Petitioner's direct appeal:

> The victim, [S.R.],[1] and the [Petitioner] ended their romantic relationship in July of 1999. On July 31, 1999, [S.R.], believing the [Petitioner] would be at work, returned to the duplex where she and the [Petitioner] lived to retrieve the rest of her personal belongings. As [S.R.] was packing her clothing, the [Petitioner] entered the residence. Once inside the bedroom, the [Petitioner], who smelled of alcohol, accused [S.R.] of "being with someone else," and called her a "whore" and a "bitch." He then began hitting [S.R.] with his fists and kicking her, while she pleaded and screamed for him to stop. He also whipped her with an extension cord which he pulled from the television set. During the beating, her clothes were "snatched" off.
>
> Thereafter, [S.R.] was dragged by her hair from the bedroom to the kitchen. The [Petitioner] tied her hands behind her back, and "he got two chairs from the kitchen table and he had opened [her] legs and tied [her] legs to each chair." Her legs were tied with the extension cord earlier used to whip her, and her hands were tied with a rope. While she was tied up, he also beat her with a board, and held his "work" boots on her throat. [S.R.] testified that,
>
>> He was steady drinking. He had lit a cigarette, and then he went in the other room and got a clothes hanger out of the closet, and he came back in the kitchen, and he turned the stove on, and started untwisting the clothes hanger, and he made it straight, and then he started twisting it up, and he turned the stove on and struck the clothes hanger on the stove and let it get hot, and then he had got some rubbing alcohol, and then he was steady drinking and smoking cigarettes, and then he started saying, "Bitch, I'm going to stick this so nobody won't want you," and he took the clothes hanger from

---

[1] It is the policy of this court to refer to the victims of sexual assault only by their initials.

the stove, and he stuck it between my legs while he was pouring alcohol [into my vagina].

The [Petitioner] held a towel on [S.R.'s] face to quiet her screams while he raped her with the heated coat hanger. After the coat hanger was removed from her vagina, the [Petitioner] said, "[b]itch, that's what you get. You made me do these things to you."

[S.R.] was then untied from the chairs, dragged into the bedroom again by her hair, and thrown onto the bed. At trial, she testified,

> Q. And what happened once he put you up on the bed- or threw you up on the bed?
>
> A. He forced me to have – forced me to have sex with him.
>
> Q. Your hands were still tied up?
>
> A. Yes.
>
> Q. How did he force you to have sex with him? What did he do?
>
> A. He opened my legs up....
>
> A. He pulled his pants down, and he stuck his thing inside me. He said, "Bitch, open your legs," and I started screaming. I was telling him to stop....
>
> Q. You were hollering. Did he make any threats towards you this time?
>
> A. He was steady saying, "Bitch, shut up or I'll kill you."

Before leaving the duplex, the [Petitioner] noticed blood on the sheets. He removed [S.R.] from the bed and proceeded to wash the sheets. Once the [Petitioner] finished washing the sheets, he locked the door and left the residence. [S.R.] remained tied up for "thirty/forty-five minutes to an hour." After she untied herself, she crawled to the living room window.

-3-

She was unable to exit the home because the [Petitioner] had previously taken her keys, and the windows were barred. [S.R.] waited for about thirty minutes at the window until she saw her neighbor, Eva Tillman, who phoned 911. Upon arrival at the home, the police were unable to open the door, so the firemen were called to break down the door.

[S.R.] was taken to the hospital where she received extensive medical treatment. The nurse, Sally DiScenza, testified that upon [S.R.'s] arrival at the hospital, her vagina was very red, and had "a lot of drainage as you get … when skin is burned, and you have the drainage from the cell destruction and when … bacteria is introduced." Because [S.R.] was in extreme pain, a speculum exam was performed very quickly. Consequently, no forensic evidence was obtained. Ms. Di[S]cenza also observed [S.R.'s] many other bruises and wounds. [S.R.] suffered permanent scarring from the incident.

*State v. Eddie Medlock*, No. W2000-03009-CCA-R3-CD, 2002 WL 1549707, at *1-2 (Tenn. Crim. App. Jan. 16, 2002).

A copy of the transcript of the trial, which was made an exhibit at the post-conviction hearing, shows that the forensic nurse testified that she waited for the arrival of a surgeon to perform the internal examination of the victim and that she gave the surgeon "some Q-tips to quickly swab" but that "[i]t was not a good collection" because the victim couldn't tolerate the pain. The witness stated that a "kit" was collected but that to her knowledge, no sperm was recovered. She stated, "To be honest, I don't have the lab report." She clarified that she did not expect that the swabs would yield evidence because of the victim's injuries and the circumstances of collection.

In cross-examining the victim, trial counsel began to ask about the victim's past relationship with the Petitioner and a "fight" she had with her sister prior to the crimes. The prosecutor objected, and the trial court warned trial counsel that he was getting close to "opening the door" to testimony about prior assaults the Petitioner had committed against the victim. Trial counsel then began asking the victim whether or not another man, Albert Triple, had committed an aggravated assault against her, and whether the offenses at issue had not also been committed by Mr. Triple. Trial counsel also asked the victim whether or not Mr. Triple had burned her, and she responded that the Petitioner had done it. The trial court then allowed the prosecution to introduce proof that the Petitioner had burned the victim with cigarettes on one prior occasion and with a fireplace lighter on another occasion. The victim also testified that Mr. Triple was a stranger who had hit her in the head with a pistol.

-4-

On direct appeal, this court, concluding that the kidnapping offense was one continuous course of conduct, vacated one count of especially aggravated kidnapping. *Id.* at *3. The convictions and sentences were otherwise affirmed. *Id.* at *9. The mandate was issued on July 19, 2002.

## Post-Conviction Proceedings

On June 27, 2003, the Petitioner filed a timely petition for post-conviction relief, alleging primarily ineffective assistance of counsel. The Petitioner moved the post-conviction court to allow him to examine any deoxyribonucleic acid ("DNA") evidence or lab results, based on the testimony of the forensic nurse. The Petitioner was appointed counsel, and counsel filed an amended petition. In April 2005, the Petitioner's counsel moved the court for funding to obtain DNA testing at an independent laboratory. The motion alleged that evidence collected from the victim had been tested by the Tennessee Bureau of Investigation ("TBI") in 2005, that the results were inconclusive, and that an independent laboratory might be able to find exonerating evidence. In sum, the Petitioner sought testing which could detect the perpetrator's DNA profile from the evidence. Counsel argued that the denial of such funding to non-capital defendants was a due process and equal protection violation. The post-conviction court denied the motion for funding but allowed the Petitioner to pursue an interlocutory appeal. This court entered an order on October 12, 2005, denying the Petitioner's interlocutory appeal and noting that the issue could be raised after final judgment was entered in the post-conviction matter. On February 6, 2006, the Tennessee Supreme Court denied the application for permission to appeal.

From the record before us, it appears that no further action was taken in this matter until August 28, 2012, when the Petitioner again amended the petition for post-conviction relief. There is nothing in the record to explain the reason for this six-year period of inactivity.[2] The record contains two motions which the Petitioner attempted to file pro se in 2014. The matter was finally heard beginning on August 5, 2015, approximately twelve years after the petition was filed.

We note that the judgments from which the Petitioner appeals do not appear in the record. While the original judgment sheets were part of the original appellate record, a copy of which was introduced as an exhibit at the post-conviction hearing, this court ordered the entry of corrected judgment sheets after the decision on appeal, and these do not appear anywhere in the record.[3] We conclude, however, that the record is adequate to

---

[2] The trial judge who had denied the motion for DNA testing passed away in 2013 and the hearing on this matter was conducted by a newly-appointed judge.

[3] The original judgment sheets contain other inaccuracies which we do not address on this appeal.

-5-

allow review of the issues raised. *See Jerrie Bryant v. State*, No. M2010-01954-CCA-R3-PC, 2011 WL 5052480, at *14 n.1 (Tenn. Crim. App. Oct. 25, 2011) (noting that amended judgments were not attached to the petition and assuming that the petitioner's representation regarding resentencing was correct for the purposes of analysis).

The Petitioner alleges on appeal that he received the ineffective assistance of counsel when trial counsel did not obtain an expert to analyze the forensic evidence recovered from the victim; when trial counsel and appellate counsel did not challenge the failure to charge aggravated sexual battery and sexual battery as lesser-included offenses of aggravated rape; when trial counsel failed to meet with the Petitioner; and when trial counsel's cross-examination of the victim "opened the door" to testimony regarding prior assaults the Petitioner had committed against the victim. Accordingly, we will limit our summary of the proof at the hearing to testimony bearing on these issues.

Lawrence James, a special agent forensic scientist and supervisor with the TBI, testified regarding the testing of the samples obtained from the victim. Special Agent James testified that he had been working with the TBI at the time of the Petitioner's trial and that the TBI had upgraded testing equipment around 1999 or 2000. The same equipment was in use in 2005, and other upgrades occurred around 2007 and 2010. He testified that Special Agent Qadriyyah Debnam had attempted, in 2005, to perform testing on the samples taken from the victim. Special Agent Debnam was able to isolate some sperm in the samples, but she determined there was not enough to attempt to create a DNA profile. She analyzed the nonsperm fraction of the samples and found the victim's DNA. Special Agent James testified that the decision not to test a sample because it appeared insufficient was within the discretion of an individual agent, that it would have been reviewed by other agents, and that it was not a "wrong" decision. He agreed that it was possible that an independent laboratory in 2005 might have been able to obtain DNA from the sperm in the sample. However, he also testified that he was not aware of any instance in which a private laboratory had obtained a DNA profile when the TBI had not been able to. The post-conviction court, in denying the funding for further testing in 2005, found that Special Agent Debnam had also advised the parties that it was possible that another lab might be able to obtain a DNA profile.

In looking over the evidence and reports to prepare for the post-conviction hearing, Special Agent James determined that the sample was large enough to obtain a DNA profile from the sperm. He explained that the TBI's equipment was much more sensitive than it had been in 2005 and that he could obtain a profile with a much smaller sample size than would have been necessary prior to the more recent upgrades. Special Agent James found that the sample contained a mixture of DNA, and the major contributor was the Petitioner. Special Agent James also found DNA from a minor contributor, and this DNA was consistent with the victim's DNA. While he

-6-

acknowledged that another laboratory could come to a different conclusion regarding the sample, he explained that the difference would primarily be the ratio of the major and minor contributor, because the laboratory would have to use a different cutting of the swab. He testified that he would expect that another laboratory would still find the Petitioner's DNA.

The Petitioner's trial counsel testified that he was aware, from a notation on the victim's forensic evaluation, that a kit had been collected from the victim, that he inquired about this evidence, and that he was told by the prosecution that nothing of value was collected because the victim's pain precluded a standard examination. He acknowledged that he did not seek to test the swabs which were collected. He testified that he would have preferred not to test the evidence for DNA due to the possibility that it would be inculpatory, particularly given that the victim and Petitioner had recently been in a relationship.

The jury was instructed regarding rape as a lesser-included offense of aggravated rape, and trial counsel did not recall why the jury was not instructed on any other lesser-included offenses of aggravated rape. He did not include the issue in his motion for a new trial. Appellate counsel testified that he did not raise the issue regarding failure to charge lesser-included offenses because the Petitioner's theory at trial was that someone else was the perpetrator of the crime, not that a lesser crime had been committed.

Trial counsel testified that he might have only visited the Petitioner twice in prison but that he met with him at other times in jail and on several report dates. Trial counsel acknowledged that he opened the door to some testimony regarding prior assaults that the Petitioner had committed against the victim.

The Petitioner testified that trial counsel told him that no DNA evidence was available and that the judge would not approve funding for a "rape expert" to dispute the forensic nurse's testimony that the victim could not be examined due to pain. According to the Petitioner, trial counsel refused to communicate with him or with his family, and the total time he spent meeting with trial counsel prior to trial was one and one-half hours. The Petitioner faulted trial counsel for failing to examine a police report regarding the victim's assault by Mr. Triple and stated that photos from that assault showed prior scarring that could not be attributed to the conviction offenses.

The post-conviction court denied the petition for relief. It found that trial counsel was not deficient in failing to retain an expert because the technology in place at the time would not have allowed for testing and because failure to test was sound trial strategy given the likelihood of a positive result. The court also found no prejudice because testing would have further incriminated the Petitioner. The post-conviction court

concluded that the Petitioner had not shown prejudice from trial counsel's failure to request lesser-included offenses and appellate counsel's decision not to appeal the issue. The court likewise found that there was no evidence of prejudice from trial counsel's alleged failure to meet with the Petitioner. The post-conviction court noted that the cross-examination of the victim was a reasonable strategic decision even though it opened to the door to evidence of prior assaults, and it further found that the evidence was so overwhelming that the admission of evidence of prior assaults could not have affected the outcome of trial.

The Petitioner acknowledges that he did not present evidence of prejudice regarding trial counsel's failure to test, at the time of the trial, the swabs taken from the victim. However, he argues that he was unable to present evidence because the post-conviction court denied his motion for funding, and he alleges that the denial of funding was a violation of his right to equal protection and due process. Accordingly, the Petitioner asserts that the post-conviction court erred in denying funding for a DNA expert as well as that the post-conviction court erred in denying the petition on its merits.

## ANALYSIS

### I. Funding for Expert Testimony

The Petitioner argues that the post-conviction court erred in denying him funding for further DNA analysis. We conclude that this issue has been rendered moot by the testing performed by the TBI in 2015.

Mootness is a doctrine regarding the justiciability of a controversy. *McIntyre v. Traughber*, 884 S.W.2d 134, 137 (Tenn. Ct. App. 1994). A case is justiciable when it involves "a genuine and existing controversy requiring the present adjudication of present rights." *Id.* "A moot case is one that has lost its character as a present, live controversy. The central question in a mootness inquiry is whether changes in the circumstances existing at the beginning of the litigation have forestalled the need for meaningful relief." *Id.* (citations omitted). When the case may no longer provide relief to the prevailing party, it is considered moot. *Id.*

The Petitioner's 2005 request for independent testing was premised on the assertion that an independent laboratory could possibly create a DNA profile from the sperm in the sample taken from the victim, whereas the TBI's 2005 results had been inconclusive. The crux of the Petitioner's motion was a request that the State fund a second test, one that would be able to retrieve the DNA profile in the sperm recovered from the victim. While the Petitioner requested that the testing be done by an independent facility, this request was not based on any allegation that the TBI testing was

improper, but merely on speculation that another facility might have more sensitive equipment which could create a DNA profile. The request for funds for independent testing was denied, but the TBI nevertheless retested the sample using more sensitive equipment in 2015. This equipment was able to create a DNA profile from the sperm in order to help identify the assailant. In an unsurprising turn of events, it was the Petitioner. Accordingly, the relief which the Petitioner sought — further testing to establish the DNA profile associated with the sperm — was in fact granted. The Petitioner's counsel did not file any subsequent motions asserting that yet another test was necessary because the 2015 results were somehow invalid. Instead, the Petitioner in 2005 asked for additional DNA testing at the State's expense to create a profile of the assailant, and in 2015 additional DNA testing, which successfully created a profile of the assailant, was in fact performed — at the State's expense. Accordingly, there is no justiciable controversy between the parties, and we conclude the Petitioner was ultimately granted the relief he sought.

The Petitioner nevertheless asserts on appeal that independent testing performed in 2005 might have come to a different result, despite the testimony from Special Agent James that, while another laboratory could have found a different ratio of DNA, it would not have achieved a result that excluded the Petitioner. In any event, the Petitioner acknowledges that the Rules of the Supreme Court of Tennessee mandate that "[i]n non-capital post-conviction proceedings, funding for investigative, expert, or other similar services shall not be authorized or approved." Tenn. R. S. Ct., Rule 13, § 5(a)(2). The Petitioner likewise acknowledges that the Tennessee Supreme Court has decided this issue in *Davis v. State*, 912 S.W.2d 689, 695 (Tenn. 1995). However, he argues that his rights to due process and equal protection have been violated because capital post-conviction petitioners may be entitled to funding for expert assistance. *Owens v. State*, 908 S.W.2d 923, 927-28 (Tenn. 1995).

In *Davis*, the Tennessee Supreme Court noted that there is no statutory provision entitling post-conviction petitioners to state-funded experts. *Davis*, 912 S.W.2d at 695. The *Davis* court concluded that neither was there a constitutional right to such services, relying on the fact that neither the State Constitution nor the Federal Constitution guarantees post-conviction petitioners the right to counsel. *Id.* at 696. The *Davis* court rejected the argument that the denial of State funding for expert services could constitute a violation of due process or equal protection. *Id. Davis* cited to *Owens*, in which the Court had earlier concluded that the statute entitled capital post-conviction petitioners to expert assistance in some circumstances. *Id.* at 695 (citing *Owens v. State*, 908 S.W.2d 923 and T.C.A. § 40-14-207(b)). The Petitioner was not entitled to testing under *Davis*.

We note that, since the opinions in *Davis* and *Owens*, the Legislature has enacted the "Post-Conviction DNA Analysis Act of 2001." *See* T.C.A. §§ 40-30-301 to -313.

-9-

This Act does not distinguish between capital and non-capital defendants, and it entitles persons convicted of, among other crimes, aggravated rape to request the "the forensic DNA analysis of any evidence that is in the possession or control of the prosecution, law enforcement, laboratory, or court, and that is related to the investigation or prosecution that resulted in the judgment of conviction and that may contain biological evidence." T.C.A. § 40-30-303. As a general rule of statutory construction, a particular provision of a statute will prevail over a more general provision. *Keough v. State*, 356 S.W.3d 366, 371 (Tenn. 2011). "When two statutes seemingly address the matter in question, and one is special and particular and the other is general, then the general statute will be construed so as to operate on all the subjects introduced therein except the particular one which is the subject of the special provision." *State v. Davis*, 173 S.W.3d 411, 415 (Tenn. 2005). We conclude that the Petitioner's request for DNA analysis would best have been analyzed under the statute.

Under the Post-Conviction DNA Analysis Act of 2001, the post-conviction court is required to order testing if it finds that:

> (1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;
> (2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;
> (3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and
> (4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

T.C.A. § 40-30-304. The court may additionally order testing if it finds that:

> (1) A reasonable probability exists that analysis of the evidence will produce DNA results that would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction;
> (2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;
> (3) The evidence was never previously subjected to DNA analysis, or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and

-10-

(4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

T.C.A. § 40-30-305. When testing is ordered pursuant to section -304, "the court shall order the analysis and payment, if necessary." T.C.A. § 40-30-306. However, for testing pursuant to section -305, "the court may require the petitioner to pay for the analysis." *Id.*

Both these statutory provisions require a finding that the evidence was either not previously tested for DNA or was "not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis." The Petitioner, in his 2005 motion, did not ask the post-conviction court to make any factual findings regarding whether the analysis could resolve an issue not resolved by previous analysis or whether there was a reasonable probability either that the verdict would have been more favorable or that the Petitioner would not have been prosecuted. Accordingly, any analysis of the issue under this provision is waived. The Petitioner is not entitled to relief.

## II. Ineffective Assistance of Counsel

The Post-Conviction Procedure Act provides relief when a conviction or sentence is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. The petitioner bears the burden of proving the allegations of fact in the petition by clear and convincing evidence. T.C.A. § 40-30-110(f); *Ward v. State*, 315 S.W.3d 461, 465 (Tenn. 2010). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). The findings of fact made by a post-conviction court are conclusive on appeal unless the evidence preponderates against them. *Ward*, 315 S.W.3d at 465. This court may not substitute its own inferences for those drawn by the post-conviction court, and questions concerning the credibility of witnesses, the weight and value of the evidence, and the factual issues raised by the evidence are to be resolved by the post-conviction court. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001). Mixed questions of fact and law are reviewed de novo, with a presumption of correctness applied to the factual findings. *Ward*, 315 S.W.3d at 465. A claim of ineffective assistance of counsel raises a mixed question of law and fact. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). The trial court's conclusions of law are reviewed under a purely de novo standard with no presumption of correctness. *Id.*

Both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee the criminally accused the right to representation by counsel. *Pylant v. State*, 263 S.W.3d 854, 868 (Tenn. 2008). The right to counsel encompasses "the right to 'reasonably effective' assistance, that is, assistance 'within the range of competence demanded of attorneys in criminal cases.'" *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). In evaluating a claim of ineffective assistance of counsel, the court must determine "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006) (quoting *Strickland*, 466 U.S. at 686).

To show that relief is warranted on a claim of ineffective assistance of counsel, the petitioner must establish both that counsel's performance was deficient and that the deficiency prejudiced the defense. *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007). Deficiency requires showing that counsel's errors were so serious "that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. To demonstrate deficiency, the petitioner must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Pylant*, 263 S.W.3d at 868. Courts must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Felts v. State*, 354 S.W.3d 266, 277 (Tenn. 2011) (quoting *Strickland*, 466 U.S. at 689). "[A] reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Felts*, 354 S.W.3d at 277 (quoting *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999) *abrogated on other grounds as recognized in State v. Randall T. Beaty*, No. M2014-00130-CCA-R3-CD, 2016 WL 3752968, at *31 (Tenn. Crim. App. July 8, 2016)). In evaluating counsel's performance, "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (quoting *Strickland*, 466 U.S. at 690-91). The reviewing court must begin with "the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all strategic and tactical significant decisions." *Davidson v. State*, 453 S.W.3d 386, 393 (Tenn. 2014).

In determining prejudice, the post-conviction court must decide whether there is a reasonable probability that, absent the errors, the result of the proceeding would have been different. *Grindstaff*, 297 S.W.3d at 216. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Honeycutt*, 54 S.W.3d

at 768 (Tenn. 2001) (quoting *Strickland,* 466 U.S. at 694). "That is, the Petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." *Finch*, 226 S.W.3d at 316 (Tenn. 2007). "A reasonable probability of being found guilty of a lesser charge, or receiving a shorter sentence, satisfies the second prong of *Strickland*." *Pylant*, 263 S.W.3d at 869.

Because both prongs must be established for relief, a court need not address both if the defendant has failed to prove either deficiency or prejudice. *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Failure to show either deficiency or prejudice precludes relief. *Felts*, 354 S.W.3d at 277.

## A. DNA Testimony

The Petitioner first asserts that he received the ineffective assistance of counsel when trial counsel did not insist on having laboratory testing of the swabs collected by the forensic nurse. The post-conviction court found that trial counsel's failure to require DNA testing was not deficient because testing could not have been conducted with the technology in existence at the time and also because choosing to avoid testing was a reasonable trial strategy. Moreover, the court found that the Petitioner could not demonstrate prejudice.

We agree with the post-conviction court's analysis on this issue. This claim is easily disposed on the grounds that the TBI testing revealed the Petitioner's DNA in the samples and thereby precludes any possibility of finding prejudice. The omitted testing has proven inculpatory to the Petitioner and bolsters the already strong proof that he was, as the victim testified, the perpetrator of the crimes. Furthermore, the evidence introduced at the post-conviction hearing suggests that testing at the time of the trial would have been fruitless because technology would not have allowed the forensic scientists to create a DNA profile. Indeed, an attempt at testing in 2005 failed when Special Agent Debnam found the sample to be of an insufficient size. The Petitioner has not presented any proof that the testing could have been exculpatory. Neither has he shown deficiency in the failure to request testing, because the evidence at the hearing suggests that testing would not have been possible. Moreover, the post-conviction court found the lack of testing to be reasonable trial strategy, as trial counsel testified that he would not have wanted testing of the swabs because there was some likelihood that testing would reveal the Petitioner's DNA, given the victim's testimony at trial and the fact that the victim and the Petitioner had recently been romantically involved. We conclude that the Petitioner has failed to establish either that his trial counsel was deficient or that there was any possibility of prejudice.

## B. Lesser-Included Offenses

The Petitioner also faults both his appellate and his trial counsel for failing to challenge the trial court's decision not to charge sexual battery or aggravated sexual battery as lesser-included offenses of aggravated rape. We conclude that the post-conviction court correctly found that the Petitioner cannot show any prejudice on these claims.

The trial court charged the jury with rape as a lesser-included offense of aggravated rape. Trial counsel acknowledged that he had not asked for aggravated sexual battery or sexual battery to be charged as lesser-included offenses. An erroneous failure to instruct on lesser-included offenses which are supported by the evidence is a constitutional error. *State v. Ely*, 48 S.W.3d 710, 726 (Tenn. 2001). Failure to request lesser-included offenses is not deficient performance when it is a matter of strategy, *Moore v. State*, 485 S.W.3d 411, 419 (Tenn. 2016), but here, trial counsel did not testify that it was a strategic decision. At the time of the Petitioner's trial, the trial court was required to instruct the jury on lesser-included offenses even absent a written request from trial counsel. T.C.A. § 40-18-110(a) (2000) ("It is the duty of all judges charging juries in cases of criminal prosecutions for any felony wherein two (2) or more grades or classes of offense may be included in the indictment, to charge the jury as to all of the law of each offense included in the indictment, without any request on the part of the defendant to do so."); *compare* T.C.A. § 40-18-110(a), (c) (2002) (requiring counsel to submit a written request). The instructions were not requested and the failure to instruct was not raised in the motion for a new trial or on appeal.[4]

"For ineffective assistance of counsel claims arising from the failure to properly request lesser-included offense instructions, the prejudice inquiry assesses whether a reasonable probability exists that a properly instructed jury would have convicted the petitioner of the lesser-included offense instead of the charged offense." *Moore*, 485 S.W.3d at 420-21. This analysis "mirrors" the constitutional harmless error standard that would be applied had the issue been raised on direct appeal. *Id.* at 421.

The Tennessee Supreme Court in *Moore* clarified that the prejudice analysis in an allegation of error based on a failure to charge lesser-included offenses is dependent on a determination regarding whether or not any intervening or intermediate lesser-included offenses were charged to the jury. *Id.* If the jury rejected an intervening lesser-included offense, then the reviewing court can conclude that the petitioner was not prejudiced by

---

[4] There was some brief testimony at the hearing that the trial judge who presided over the case had refused to instruct on lesser-included offenses in several trials around that time period, resulting in the reversal of some convictions.

the failure to charge any additional lesser-included offenses, as the jury necessarily rejected them in rejecting the intervening lesser-included offense.[5] *See State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998); *but see State v. Stephen John Abbott*, No. 01C01-9704-CC-00122, 1998 WL 847919, at *28–29 (Tenn. Crim. App. Dec. 9, 1998) (Smith, J., dissenting) (noting that the "principal distinction" between the charged and omitted lesser-included offenses was hotly contested at trial). When the jury "by finding the defendant guilty of the highest offense to the exclusion of the immediately lesser offense, necessarily rejected all other lesser-included offenses," then the error in failing to instruct on lesser-included offenses is harmless on direct appeal under *Williams*. *State v. Allen*, 69 S.W.3d 181, 191 (Tenn. 2002); *see State v. Banks*, 271 S.W.3d 90, 128-29 (Tenn. 2008). Likewise, when the jury has rejected an intervening lesser-included offense, the petitioner cannot demonstrate prejudice on post-conviction review. *Moore*, 485 S.W.3d at 421.

On the other hand, when there is no intervening lesser-included offense, the reviewing court must consider the record, the evidence presented at trial, the defendant's theory, and the jury's verdict. *Id.* at 422. "In examining the evidence presented at trial, the harmless error analysis focuses on the distinguishing element between the greater and lesser offenses, the strength of the evidence of the distinguishing element, and the existence of contradicting evidence of the distinguishing element." *Id.* If the court determines that there is no reasonable probability that a properly instructed jury would have convicted on the lesser-included offenses, then the petitioner is not entitled to relief. *Id.* at 423-24 (concluding that overwhelming evidence supported the distinguishing element between the greater and lesser offenses).

In applying this analysis, we note that, under current law, sexual battery is a lesser-included offense of the charged, intervening lesser-included offense of rape. T.C.A. § 40-18-110(g)(4). The State correctly notes that rape is not, however, an intermediate offense between aggravated sexual battery and aggravated rape, because aggravated sexual battery is not a statutorily-defined lesser-included offense of rape. T.C.A. § 40-18-110(g)(3). At the time of the Petitioner's trial, this court had come to the same conclusion. *See State v. Clyde Hambrick, Jr.*, No. E1998-0893-CCA-R3-CD, 2000 WL 823467, at *11 (Tenn. Crim. App. June 27, 2000) (concluding that aggravated sexual battery was not a lesser-included offense of rape).

---

[5] The Tennessee Supreme Court has previously rejected what it dubbed the "strict approach" of "holding that a defendant can never show prejudice stemming from the failure to charge a lesser-included offense when the defendant has been found guilty of a greater offense." *Bryant v. State*, 460 S.W.3d 513, 527 (Tenn. 2015), *overruled on other grounds by Moore*, 485 S.W.3d at 421. "A jury, having heard the complete jury instructions, inevitably considers, 'albeit not explicitly, all applicable lesser-included offenses supported by the proof.'" *Id.* (quoting *State v. Davis*, 266 S.W.3d 896,904 (Tenn. 2008)).

We conclude that the Petitioner's claim that the failure to charge sexual battery as a lesser-included offense of aggravated rape is best analyzed under *Williams*. Because the jury was charged with and rejected the intervening lesser-included offense of rape, the Petitioner cannot show any prejudice. *See*, *e.g.*, *State v. Bowles*, 52 S.W.3d at 78 (applying the *Williams* analysis to find any error in failing to charge sexual battery was harmless beyond a reasonable doubt when the jury was charged with the lesser-included offenses of rape and aggravated sexual battery and chose to convict the defendant of aggravated rape).

Neither can the Petitioner show any prejudice with regard to the failure to charge aggravated sexual battery. Aggravated rape includes the "unlawful sexual penetration of a victim by the defendant" where either "[f]orce or coercion is used to accomplish the act and the defendant is armed with a weapon" or the defendant causes "causes bodily injury to the victim." T.C.A. § 39-13-502(a)(1), (2) (1999). The indictment alleged one count of aggravated rape by bodily injury and one count in which the Petitioner was armed with a weapon. Aggravated sexual battery includes "unlawful sexual contact with a victim by the defendant" where either "[f]orce or coercion is used to accomplish the act and the defendant is armed with a weapon" or the defendant "causes bodily injury to the victim." T.C.A. § 39-13-504(a)(1), (2) (1999). Under *Moore*, we examine the distinguishing element, the strength of evidence on the distinguishing element, and the existence of countervailing evidence on the element. *Moore*, 485 S.W.3d at 423. The distinguishing element between the crimes is that one requires unlawful sexual contact, while the other requires unlawful sexual penetration. Sexual contact includes "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6) (1999). Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." T.C.A. § 39-13-501(7) (1999). The proof at trial, including the victim's testimony and that of the forensic nurse, overwhelmingly established that the victim was sexually penetrated and sustained internal injuries in the course of the assault. The scorched clothes hanger was recovered by police, and sperm was ultimately recovered from the victim's forensic exam. The Petitioner at trial never contested that the victim was penetrated, choosing instead to challenge her identification of him as the assailant. Accordingly, there is no reasonable probability that a properly instructed jury would have convicted the Petitioner on any lesser-included offenses. The Petitioner has failed to establish prejudice from counsel's failure to request or appeal the jury instructions regarding lesser-included offenses.

## C. Preparation for Trial

The Petitioner also asserts that trial counsel was deficient in failing to meet with him a sufficient number of times in preparation for trial. The post-conviction court noted that trial counsel testified that he met with the Petitioner a "sufficient number of times to prepare for trial." Although the post-conviction court made no specific credibility determination, we conclude it implicitly credited counsel's claims. Moreover, while the Petitioner testified that he did not meet with trial counsel a sufficient number of times, he has introduced no evidence regarding how meeting with trial counsel more often would have affected the outcome of the trial. Likewise, the Petitioner asserts on appeal that trial counsel did not investigate properly, but he makes no specific factual allegations regarding a failure to investigate and makes no specific allegations of prejudice. *State v. Hester*, 324 S.W.3d 1, 80 (Tenn. 2010) ("A reviewing court may deem an issue waived when a party fails to develop an argument in support of its contention or merely constructs a skeletal argument."); Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). The Petitioner has not shown that more frequent communication or further investigation would have led to a reasonable probability that the outcome of the trial would have been different. The convictions were supported by overwhelming evidence, including the victim's testimony, evidence regarding the victim's injuries, physical evidence recovered from the home, and the circumstances of the victim's rescue from the locked residence. Accordingly, the Petitioner has failed to establish any sort of prejudice.

## D. Evidence of Prior Assaults

The Petitioner likewise asserts that trial counsel was deficient in questioning the victim about an assault perpetrated by Mr. Triple, thereby opening the door to evidence regarding prior abuse that the victim suffered at the hands of the Petitioner. The post-conviction court found both that this was a strategic decision and that the admitted evidence did not affect the results of the trial. The Petitioner's trial strategy was to admit that the victim had been assaulted but suggest that she had been assaulted by a third party, most likely Mr. Triple. Strategic choices such as this are "virtually unchallengeable." *Kendrick*, 454 S.W.3d at 458 (quoting *Strickland*, 466 U.S. at 690). Moreover, we agree with the trial court's conclusion that there is no reasonable probability that admitting evidence of the Petitioner's prior assaults would have affected the outcome, given the victim's strong testimony, the physical evidence regarding the victim's injuries and the circumstances in which she was found in the Petitioner's home, and the heinous nature of the crimes for which the Petitioner was on trial.

## CONCLUSION

Based on the foregoing analysis, we affirm the denial of post-conviction relief.


_____
JOHN EVERETT WILLIAMS, JUDGE